# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

Nos. 06-2519/2630

_____

Broderick Collier,      *
     *
     Appellant/Cross-Appellee,      *
     *
     v.      *      Appeal from the United States
     *      District Court for the
Larry Norris, Director, Arkansas      *      Eastern District of Arkansas.
Department of Corrections,      *
     *
     Cross-Appellant/Appellee.      *
     *

_____

Submitted: February 12, 2007
Filed: April 16, 2007

_____

Before LOKEN, Chief Judge, O'CONNOR[*], Associate Justice (Ret.) and GRUENDER, Circuit Judge.

_____

GRUENDER, Circuit Judge.

Broderick Collier was convicted in Arkansas state court of first-degree murder and sentenced to 44 years' imprisonment. The Arkansas Court of Appeals affirmed the conviction. After the Arkansas Supreme Court denied post-conviction relief,

---

[*] The Honorable Sandra Day O'Connor, Associate Justice of the United States Supreme Court, (Ret.), sitting by designation, pursuant to 28 U.S.C. § 294(a).

Collier filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The district court[1] denied habeas relief but granted a certificate of appealability. Collier now appeals the denial of the writ, and we affirm.

## I.    BACKGROUND

In July 1996, Adam Wilstead was driving past 2205 Walker Street in Little Rock, Arkansas, when shots were fired into his car. He subsequently died from shotgun wounds to the head and neck. Dixie Griffin told investigators that Keon Neeley had fired a shotgun and Collier had fired a pistol at Wilstead's car. Collier was charged with first-degree murder as an accomplice; Neeley was never charged.

### A.    The Trial Proceedings

Dixie Griffin was the only witness at trial who testified to seeing Collier and Neeley commit the murder. Dixie Griffin lived at 2205 Walker Street with her brother, Duke Hinerman, Lisa Pike Collier ("Lisa Pike"), who was then engaged and later married to Collier, as well as a man named Charles Bell. Dixie Griffin testified that on the night of the murder a car repeatedly drove by the Walker Street house with its headlights turned off. Because her roommate, Lisa Pike, had a verbal altercation with someone one or two weeks before this incident, the women feared that the car was planning a drive-by shooting. Eventually Lisa Pike called Collier, who subsequently arrived at the house with Neeley in Lisa Pike's maroon Oldsmobile. Neeley carried a sawed-off shotgun with duct tape on it that Dixie Griffin recognized as Collier's, and Collier had a pistol. Collier, Neeley and Lisa Pike then went outside, and Dixie Griffin stayed inside by the front door of the house. From her view, Dixie Griffin saw the car drive by again and watched as Neeley and Collier began shooting

---

[1]The Honorable J. Leon Holmes, Chief Judge, United States District Court for the Eastern District of Arkansas.

at the car and continued shooting as they chased the car down the street. They shot at the car until it hit a ditch and wrecked. Dixie Griffin then called the police. The police eventually took Dixie Griffin, Lisa Pike, Collier and Bell to the police station. All four denied knowing who shot Wilstead. Dixie Griffin testified at trial that she did not tell the police that Collier was one of the shooters because Lisa Pike was her best friend and she feared reproach from Collier. Thirteen months later she came forward, told the police what she had seen on the night of the murder and implicated Collier. Dixie Griffin testified that she decided to come forward because she had begun to feel sorry for Wilstead's mother.

Bell testified that he lived and was present at 2205 Walker Street at the time of the Wilstead murder. He testified that after the car drove by a few times Lisa Pike went into her room where there was a telephone. Shortly after she came out of her room, Collier and another man arrived. A few minutes later, Collier, the man he arrived with and Lisa Pike went outside. Bell was in the kitchen when he heard gunshots. Shortly after the gunshots ceased, Collier and Lisa Pike came back inside the house. Dixie Griffin then called the police. Bell admitted that he lied to the police that night when he told them that "he didn't know of anyone from 2205 Walker Street that did any shooting."

Hinerman's testimony revealed that he arrived home from work after the murder and while the police were on the scene conducting their investigation. As Lisa Pike was being escorted out by the police, she whispered into Hinerman's ear to "get the gun." From this, he understood she meant Collier's duct-taped 12-gauge shotgun, which Hinerman then retrieved from the maroon Oldsmobile and hid in the crawlspace underneath the house.[2] Hinerman was not interviewed on the night of the murder. The following day, Collier asked Hinerman where the shotgun was hidden. After Hinerman told him where to find it, Collier retrieved the gun and expressed his

---

[2]The record is unclear as to what happened to the pistol.

appreciation to Hinerman. It was not until seven months later that Hinerman first told the police what he knew about the Wilstead murder and his conversation with Collier the day after it. Hinerman testified that he decided to come forward after he had been a victim of a shooting himself and began to feel that "anybody that wants to carry around guns and shoot at people or shoot people needs to be taken off the streets."

The remaining state lay witnesses included Henry Baker, Otis Griffin and Rodney Blake. Baker was in the backseat of the car driven by Wilstead at the time of the murder. His testimony confirmed that on the night of the murder they drove by 2205 Walker Street more than once and that Wilstead turned off the headlights as they approached the house. Baker heard shots from both a handgun and shotgun and felt the impact of shattered glass but did not see who had fired the shots. He recalled seeing a burgundy or maroon car that he identified as either a Buick or an Oldsmobile. Otis Griffin, Dixie Griffin's husband, was not at 2205 Walker Street on the night of the murder, but he testified that he later had a conversation with Collier during which Collier confessed to Wilstead's murder. Blake, a neighbor who lived at 2301 Walker Street, testified to hearing shots fired from both a handgun and a shotgun at the time of the murder. Blake stated the shots got "louder and louder" as they got "closer and closer" to his house. In addition to the lay witnesses, the state presented testimony from forensic experts that established Wilstead's car was punctured by shotgun pellets, that Wilstead died from shotgun wounds and that shotgun shells and waddings were found at the crime scene. The forensic evidence also established that the shells found on Walker Street were all fired from the same shotgun and that the waddings found on the street and in Wilstead's car were all from Remington-Peters 12-gauge shotgun shells.

After the trial in the Circuit Court of Pulaski County, the jury convicted Collier of first-degree murder, and the Arkansas Court of Appeals affirmed. *Collier v. State*, No. CACR00-348, 2001 WL 196953 (Ark. Ct. App. Feb. 28, 2001). Collier did not appeal to the Arkansas Supreme Court.

## B.    The Post-Conviction Proceedings

Collier timely filed a petition for post-conviction relief in the circuit court under Rule 37 of the Arkansas Rules of Criminal Procedure ("Rule 37 petition"), arguing that the State had suppressed exculpatory evidence in violation of *Brady*.[3] During the course of these proceedings, a hearing was held that adduced the following evidence. Hinerman testified that Detective Eric Knowles told him that he would receive $10,000 from Wilstead's family for information leading to the conviction of the person or persons who murdered their son. He also testified that the day after he gave his first statement to Detective Knowles he received $300 from Sergeant Terry Hastings. Hinerman confirmed that he did not receive any payment or any promise of any payment from the prosecuting attorney's office. Hinerman testified that the state prosecutor on Collier's case, Marianne Wright, explicitly told him that there was no reward, after which he "gave up on the idea pretty much." Finally, Hinerman testified that the remainder of his testimony at Collier's trial was truthful and accurate.

Wright testified that the first time she knew of any payment to Hinerman and any allegation of a promised reward was when she read Hinerman's affidavit during Collier's post-conviction proceedings. Detective Knowles testified that the only time a reward was mentioned was when Hinerman asked him about the Arkansas Crime Stoppers program, which pays money for truthful information that leads to solving a crime. Detective Knowles put Hinerman in contact with Sergeant Hastings of the Crime Stoppers program. Sergeant Hastings testified that he did not remember Hinerman; he could neither confirm nor deny that he arranged for Hinerman to be paid $300; he had no knowledge of any reward fund that was established for the homicide of Wilstead; he did not make any representation to Hinerman or anyone else that he

---

[3]*See Brady v. Maryland*, 373 U.S. 83 (1963). The Rule 37 petition also presented an ineffective assistance of counsel claim that was subsequently abandoned.

would receive a reward; and, if an officer or a detective were to promise to pay a witness in a case, it would not be consistent with department policy.

Bell and Otis Griffin did not testify at the hearing but submitted affidavits. Bell recanted his trial testimony and stated that although he heard shots fired on the night of the murder, he did not know who fired them and he did not see Collier that night until after the police had arrived. Otis Griffin also recanted his trial testimony that Collier had confessed to his involvement in the crime. Both Bell and Otis Griffin stated in their affidavits that they lied at trial because they believed they would go to jail if they did not testify on behalf of the state.

While the Rule 37 petition was pending, Collier petitioned the Arkansas Supreme Court to reinvest the circuit court with jurisdiction to consider a petition for writ of error coram nobis ("coram nobis petition"),[4] raising the same alleged *Brady* violation that he raised in his Rule 37 petition. Collier attached to his coram nobis petition the affidavits from Bell and Otis Griffin. He also submitted an affidavit from Hinerman, which proffered essentially the same statements as those he made at the Rule 37 hearing. The Arkansas Supreme Court denied the coram nobis petition, holding that Collier failed to show how he was prejudiced from the prosecution's alleged suppression of evidence that Hinerman received $300 from Sergeant Hastings and was promised an additional $10,000 by Detective Knowles in exchange for his testimony at Collier's trial (collectively, "the Hinerman impeachment evidence"). It

---

[4] A writ of error coram nobis is available under Arkansas law to address claims of insanity at the time of trial, a coerced guilty plea, material evidence withheld by the prosecutor or a third-party confession to the crime during the time between conviction and appeal. *Pitts v. State*, 986 S.W.2d 407, 409 (1999) (per curiam). The writ is appropriate only when the claim was not addressed or could not have been addressed at trial because it was somehow hidden or unknown and would have prevented the rendition of the judgment had it been known to the trial court. *Echols v. State*, 201 S.W.3d 890, 894 (2005). "[It] is an extraordinarily rare remedy, more known for its denial than its approval." *State v. Larimore*, 17 S.W.3d 87, 92 (2000).

is undisputed that the Arkansas Supreme Court made two erroneous factual statements in its opinion denying Collier's coram nobis petition: (1) it attributed portions of Dixie Griffin's testimony to Lisa Pike, who did not testify; and (2) it referred to "the testimony of other witnesses who saw the shooting," whereas only one witness, Dixie Griffin, testified that she actually saw the men who shot at Wilstead's car.

Shortly after the Arkansas Supreme Court denied coram nobis relief, the circuit court denied Collier's Rule 37 petition, holding that he failed to demonstrate prejudice from the suppression of the Hinerman impeachment evidence. Collier filed a motion to reconsider, arguing that the circuit court mischaracterized the evidence presented at trial. In response to the motion to reconsider, the circuit court entered an amended order once again denying the Rule 37 petition. The amended order also held that the Arkansas Supreme Court's coram nobis decision established the law of the case with respect to the *Brady* claim, despite its two erroneous factual findings. Collier filed notices of appeal from the original and amended orders.

On appeal from the denial of his Rule 37 petition, Collier limited his argument to the issue of whether the circuit court erred in its amended order by applying the law-of-the-case doctrine. Instead of reaching the merits of the appeal, the Arkansas Supreme Court held that the circuit court had lacked jurisdiction over the motion for reconsideration, rendering its amended order—the only one addressed on appeal by Collier—void. Noting that it does not have jurisdiction to review void orders, the Arkansas Supreme Court dismissed Collier's appeal. *See Collier v. State*, No. CR 02-780, 2004 WL 584903, at *2 (Ark. Mar. 25, 2004) (per curiam).

Collier subsequently filed a petition for writ of habeas corpus in federal district court under 28 U.S.C. § 2254. Collier's petition requested that the district court review the Arkansas Supreme Court's decisions with respect to his coram nobis and Rule 37 petitions. Respondent Larry Norris argued that Collier's habeas petition was time-barred under 28 U.S.C. § 2244(d). Alternatively, Norris argued that the

Arkansas Supreme Court's adjudication of Collier's coram nobis petition did not warrant relief under § 2254 and that Collier procedurally defaulted the claim arising from the Arkansas Supreme Court's denial of his Rule 37 petition.

The district court held that Collier's habeas petition was not time-barred but denied relief on the basis that the Arkansas Supreme Court's coram nobis decision was not contrary to, or an unreasonable application of, federal law and was not based on an unreasonable determination of facts in light of the entire record. As to the Rule 37 petition, the district court held that Collier procedurally defaulted this claim and did not demonstrate cause and prejudice to excuse the default. Collier appeals the denial of the writ, and Norris cross-appeals the district court's ruling that Collier's habeas petition is not time-barred.

## II.    DISCUSSION

### A.    Coram Nobis Petition

"Pursuant to the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), when a state prisoner files a petition for writ of habeas corpus in federal court we are directed to undertake only a limited and deferential review of underlying state court decisions." *Morales v. Ault*, 476 F.3d 545, 549 (8th Cir. 2007) (internal quotation omitted). As such, an application for habeas corpus "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

28 U.S.C. § 2254(d). Under subsection (d)(1), "[a] decision is 'contrary to' federal law . . . if a state court has arrived 'at a conclusion opposite to that reached by [the Supreme Court] on a question of law' or if it 'confront[ed] facts that are materially indistinguishable from a relevant Supreme Court precedent' but arrived at an opposite result." *Davis v. Norris*, 423 F.3d 868, 874 (8th Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). "A state court unreasonably applies clearly established federal law when it 'identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Id*. (quoting *Williams*, 529 U.S. at 413). It is not enough for us to conclude that, in our independent judgment, we would have applied federal law differently from the state court; the state court's application must have been objectively unreasonable. *Lyons v. Luebbers*, 403 F.3d 585, 592 (8th Cir. 2005) (citing *Williams*, 529 U.S. at 411).

Collier claims that the state prosecutor suppressed the Hinerman impeachment evidence in violation of the due process clause of the Fourteenth Amendment. *See Brady*, 373 U.S. at 86; *see also United States v. Bagley*, 473 U.S. 667, 676 (1985) (recognizing that *Brady* evidence includes impeachment evidence). In order to succeed on this claim, Collier must demonstrate that: (1) the prosecution suppressed evidence; (2) the evidence was material and favorable to him; and (3) prejudice ensued. *United States v. Haskell*, 468 F.3d 1064, 1075 (8th Cir. 2006). Because the State did not challenge that Collier satisfied the first and second prongs in the state court proceedings, the only issue in this habeas proceeding is the state court adjudication of whether Collier suffered prejudice as a result of the State's failure to disclose the Hinerman impeachment evidence.

Prejudice under *Brady* ensues "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (quotation omitted). A reasonable probability that the result of the proceeding would have been different "does not require demonstration by a preponderance that disclosure of the suppressed

evidence would have resulted ultimately in the defendant's acquittal," *id*. at 434, but is satisfied when the suppression "undermines confidence in the outcome of the trial," *id*. (quotation omitted). With respect to prejudice, the Arkansas Supreme Court held:

> Even if Duke Hinerman's account of having been paid $300 and promised a reward for his testimony is truthful, we cannot say that this fact had it been known to the defense at trial would have produced a different result in light of the testimony of other witnesses who saw the shooting.

*Collier v. State*, No. CACR 00-348, 2001 WL 1104764, at *2 (Ark. Sept. 20, 2001) (per curiam). In his brief, Collier argues that the Hinerman impeachment evidence, if disclosed, would have changed the outcome of the proceedings because Hinerman was the State's "main" and "only credible" witness.

Collier does not specifically identify which subsection of 2254(d) he believes entitles him to relief, but we conclude that neither entitle him to relief. We begin by holding that the Arkansas Supreme Court's decision was not "contrary to" clearly established federal law under § 2254(d)(1). The Arkansas Supreme Court correctly identified *Brady* as the clearly established law governing claims that the prosecution failed to disclose exculpatory evidence. *See Davis*, 423 F.3d at 874. Collier does not contend, and the record does not support an allegation, that the facts of his case are "materially indistinguishable" from *Brady* or that the Arkansas Supreme Court "arrived at a conclusion opposite to that reached by [the Supreme Court] on a question of law." *Id*. (internal quotation omitted). Therefore, habeas relief is not warranted under the "contrary to" provision of § 2254(d)(1). *See id* at 874-75.

Before we address the "unreasonable application" provision of § 2254(d)(1), we find it helpful to determine first whether the Arkansas Supreme Court decision was based on an "unreasonable determination of facts" under subsection (d)(2). Collier argues that the Arkansas Supreme Court made two unreasonable determinations of fact. The first error was in attributing portions of Dixie Griffin's testimony to Lisa

Pike (Ms. Collier), who did not testify. The Arkansas Supreme Court stated: "*Ms. Collier* testified that petitioner and a man named Keon arrived in a maroon Oldsmobile. . . . Both *Ms. Collier* and Duke Hinerman had seen the shotgun before in petitioner's possession." *Collier*, 2001 WL 1104764, at *1 (emphases added). The second error was in referring to "the testimony of other witnesses who saw the shooting," *id.* at *2, when only one witness, Dixie Griffin, testified to seeing the shooters. "[B]asic, primary, or historical facts" in the state court record are entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1).[5] *See Lupien v. Clarke*, 403 F.3d 615, 620 (8th Cir. 2005) (citing *Thompson v. Keohane,* 516 U.S. 99, 110-11 (1995)). Because Norris concedes that both of these factual statements were erroneous, we will assume that Collier has overcome the presumption of their correctness by clear and convincing evidence.[6] *See* 28 U.S.C. § 2254(e)(1). Notwithstanding this assumption, it does not necessarily follow that the state court adjudication was based on an unreasonable determination of facts because subsection (d)(2) instructs federal courts to evaluate the reasonableness of the state court decision "in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

We believe that the evidence in the state court record is more than sufficient to support the Arkansas Supreme Court's determination that Collier failed to show *Brady* prejudice because the suppression of the Hinerman impeachment evidence did not create a "reasonable probability that . . . the result of the proceeding would have been

---

[5]Subsection (e)(1) states: "[A] a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 21 U.S.C. § 2254(e)(1).

[6]We note that the Arkansas Supreme Court's finding that "other witnesses . . . saw the shooting" may not be erroneous, since Baker, as a passenger in Wilstead's car, did witness the shooting but was unable to identify the shooters. However, in light of Norris's concession to the error and our ultimate holding, we decline to entertain the effect of this technicality.

different." *Kyles*, 514 U.S. at 433 (quotation omitted).  At trial, Dixie Griffin testified that Lisa Pike summoned Collier to the house, where Collier arrived with Neeley in a maroon Oldsmobile.  She testified that Neeley had Collier's duct-taped sawed-off shotgun and that Collier had a handgun.  According to Dixie Griffin, the two men began shooting at Wilstead's car as it drove by the house, ran after the car and continued shooting at it until it crashed.  Although Dixie Griffin was the only witness who identified the shooters, her testimony was corroborated by other witnesses and by the forensic evidence.  First, Blake, a neighbor, and Baker, a passenger in Wilstead's car, both testified that they heard shots fired from a shotgun and a handgun, corroborating Dixie Griffin's testimony that the two different weapons were used.  Second, Blake testified further that the sounds got "louder and louder" as they got "closer and closer" to his house, corroborating Dixie Griffin's testimony that Collier and Neeley ran down the street after the car while shooting at it.  Third, the forensic evidence corroborated Dixie Griffin's testimony that Neeley fired the shotgun from the street at Wilstead's car.  Barbara Polite, the state crime scene specialist, testified that she recovered spent shotgun shells and waddings from the street and spent waddings from the inside of Wilstead's vehicle.  Polite testified that the waddings were all from Remington-Peters 12-gauge shotgun shells.  Ronald Andrejack, a tool marks examiner from the state crime laboratory, testified that the spent shells were all fired from the same shotgun.  The jury heard testimony that Collier's shotgun was indeed a 12-gauge.  Doctor William Sturner testified that Wilstead died from shotgun wounds to the head and neck.  Finally, the jury heard testimony from Otis Griffin that Collier confessed to the murder.[7]

---

[7]Although Otis Griffin recanted this part of his testimony at the Rule 37 hearing, the Arkansas Supreme Court denied Collier coram nobis relief based on Otis Griffin's affidavit because of the general rule that "a writ of error coram nobis will not lie for recanted testimony." *Collier*, 2001 WL 1104764, at *2 (citing *Taylor v. State*, 799 S.W.2d 519 (Ark. 1990); *Smith v. State*, 140 S.W.2d 675 (Ark. 1940)).  Federal habeas relief on this basis is therefore barred by the independent and adequate state grounds doctrine. *See generally Coleman v. Thompson*, 501 U.S. 722, 729-35 (1991)

We believe that the evidence in the state court record supports the Arkansas Supreme Court's reasonable determination that Collier failed to establish that the suppression of the Hinerman impeachment evidence "undermine[d] confidence in the outcome of the trial." *Kyles*, 514 U.S. at 434 (quotation omitted). Therefore, because Collier has failed to demonstrate that the adjudication of his *Brady* claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings," habeas relief is not warranted under § 2254(d)(2).

Having determined that the state court adjudication was based on a reasonable determination of the facts, we now return to the question of whether the Arkansas Supreme Court unreasonably applied *Brady* to those facts under § 2254(d)(1). *See Williams*, 529 U.S. at 413. The Arkansas Supreme Court correctly identified the issue as arising under the prejudice prong of *Brady* and focused on whether Collier had established "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Collier*, 2001 WL 1104764, at *2 (quotation omitted). It then concluded that had the Hinerman impeachment evidence been presented at trial, "we cannot say that this fact . . . would have produced a different result." *Id.* It is not clear whether, in reaching this conclusion, the Arkansas Supreme Court discredited Hinerman's testimony entirely, or only partially. We conclude that it was a reasonable application of *Brady* in either event. First, the Supreme Court cases interpreting *Brady* prejudice have endorsed both approaches. *E.g., Strickler v. Green*, 527 U.S. 263, 296 (1999) ("petitioner has

(explaining that the independent and adequate state grounds "doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement"). We see no reason to ignore Otis Griffin's original trial testimony at this stage of the proceedings, but we conclude that its absence would not affect our ultimate conclusion that confidence in the outcome of the trial has not been undermined. *See Kyles*, 514 U.S. at 434 (quotation omitted).

not convinced us that there is a reasonable probability that the jury would have returned a different verdict if her testimony had been *either* severely impeached *or* excluded entirely") (emphases added); *Kyles*, 514 U.S. at 451 ("In assessing the significance of the evidence withheld, one must of course bear in mind that not every item of the State's case would have been directly undercut if the *Brady* evidence had been disclosed."). Second, as shown by our earlier recitation of the evidence, *ante* at 12-13, even completely discrediting Hinerman's testimony would not "put the whole case in such a different light as to undermine confidence in the verdict." *Strickler*, 527 U.S. at 290 (internal quotation omitted). Accordingly, we hold that it was objectively reasonable for the Arkansas Supreme Court to conclude from its application of *Brady* that disclosure of the Hinerman impeachment evidence would not have produced a different result at trial. *See Lyons*, 403 F.3d at 592. Therefore, habeas relief is not warranted under the "unreasonable application of[ ] clearly established Federal law" provision of § 2254(d)(1).

In sum, even assuming that the Arkansas Supreme Court made two erroneous factual statements under § 2254(e)(1), we conclude that its decision was based on a reasonable determination of the facts under § 2254(d)(2) and was not contrary to, or an unreasonable application of, clearly established federal law under § 2254(d)(1). *See Rice v. Collins*, 546 U.S. 333, ---, 126 S. Ct. 969, 976 (2006) (commenting on the interplay between sections 2254(d)(1) and (d)(2) and noting that "[t]he question whether a state court errs in determining the facts is a different question from whether it errs in applying the law") Thus, we affirm the district court's denial of habeas relief for Collier's claim regarding the coram nobis decision.

## B. Rule 37 Petition

Collier's Rule 37 petition raised the same alleged *Brady* violation. The circuit court denied the petition, and Collier subsequently filed a motion for reconsideration. The circuit court entered an amended order, again denying Collier's Rule 37 petition.

-14-

Though he filed notices of appeal from both orders, Collier only addressed the amended order in his opening brief to the Arkansas Supreme Court. Under Arkansas law, he thereby waived any argument regarding the initial order. *See City of Dover v. Barton*, 29 S.W.3d 698, 703-04 (Ark. 2000). His appeal of the amended order was dismissed by the Arkansas Supreme Court on procedural grounds:

> [A]ppellant requested [in his motion for reconsideration] that the circuit court reverse itself, an act prohibited by Rule 37.2(d). Thus, the circuit court's amended order was void because it lacked jurisdiction to rehear appellant's petition. Consequently, this Court lacks jurisdiction to entertain this appeal from the amended order, and we dismiss the appeal.

*Collier v. State*, CR 02-780, 2004 WL 584903, at *2 (Ark. Mar. 25, 2004).[8]

"This Court will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman*, 501 U.S. at 729. "This rule applies whether the state law ground is substantive or procedural." *Id.* "The doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." *Id.* at 729-30. "[A] state prisoner who fails to satisfy state procedural requirements forfeits his right to present his federal claim through a federal habeas corpus petition, unless he can meet strict cause and prejudice or actual innocence standards." *Clemons v. Luebbers*, 381 F.3d 744, 750 (8th Cir. 2004). Because Collier does not attempt to satisfy the cause and prejudice or actual innocence standards and because of his reliance on *Matthews v. State*, 975 S.W. 2d 836 (Ark. 1998) (per curiam), we, like the district court, construe his argument as challenging whether the state procedural rule on which his claim was disposed is an "adequate" state ground.

---

[8]Rule 37.2(d) provides that "[t]he decision of the court in any proceeding under this rule shall be final when the judgment is rendered. *No petition for rehearing shall be considered.*" Ark. R. Crim. Pro. 37.2(d) (emphasis added).

In *Matthews*, the petitioner appealed the denial of a claim of ineffective assistance of counsel on which the circuit court had not specifically ruled in its order denying Matthew's claims for post-conviction relief. *Id*. at 836. Matthews failed to request a ruling on his ineffective assistance of counsel claim from the circuit court. *See id*. at 837. The Arkansas Supreme Court denied appellate review of the claim, citing the general rule that when a circuit court denies post-conviction relief and does not reach a specific issue, the burden is on the petitioner to obtain a ruling on that issue in order to preserve it for appeal. *Id*. (citing *Oliver v. State*, 918 S.W.2d 690, 694 (Ark. 1996)). In a subsequent decision, the Arkansas Supreme Court rejected the argument that seeking such a ruling is prohibited by Rule 37.2(d). *Beshears v. State*, 8 S.W.3d 32, 34 (Ark. 2000). Citing *Matthews*, the Arkansas Supreme Court held "that a request that the trial court modify its order to include an omitted issue is not a request for rehearing that is prohibited by Rule 37.2(d)" and denied Beshears appellate review since he failed to obtain a ruling on the omitted issue. *Id*.

Under this paradigm, Collier ostensibly argues that Rule 37.2(d) was not "adequate" to bar the appeal of his motion for reconsideration because the motion was simply his attempt to comport with the *Matthews* mandate and preserve for appeal his allegation that the circuit court, in denying his petition, mischaracterized the evidence. *See Coleman*, 501 U.S. at 729-30. Collier's *Brady* claim was the sole ground on which he petitioned for Rule 37 relief and, unlike in *Matthews* and *Beshears*, the circuit court here expressly ruled on it. The six-page order concluded that Collier had "not met his burden of proving that a *Brady* violation occurred." Collier's *Brady* claim, including the evidence on which it was based, was therefore preserved for appeal. As such, Collier's "motion to reconsider," requesting that the circuit court "grant reconsideration; set aside it's [sic] most recent order [and] grant Rule 37 relief" did not fall under the *Matthews* and *Beshears* exception to the Rule 37.2(d) prohibition of petitions for rehearing. Rather, it was expressly prohibited by the language of Rule 37.2(d) ("No petition for rehearing shall be considered."). *See McClendon v. State*, 735 S.W.2d 701, 702 (Ark. 1987) ("Rule 37 explicitly states

there will be no rehearing."). Furthermore, even if the Arkansas Supreme Court erroneously applied Rule 37.2(d) to Collier's petition, it would not make the rule "inadequate." *See Clemons*, 381 F.3d at 750 ("[F]ederal courts should not consider whether the state court *properly* applied its default rule to the claim; federal courts do not sit to correct a state court's application of its ordinarily adequate procedural rules.").

Therefore, we conclude that the Arkansas Supreme Court disposed of Collier's Rule 37 petition based on an independent and adequate state procedural rule. *See Coleman*, 501 U.S. at 729-30. Because Collier made no attempt to show cause and prejudice or actual innocence, he has forfeited his right to raise his federal claim in his habeas petition. *See Clemons*, 381 F.3d at 750.[9] Having concluded that Collier's habeas petition was properly denied, we need not reach Norris's argument on cross-appeal that the petition was untimely.

## III.    CONCLUSION

For the foregoing reasons, we affirm the district court's denial of the writ of habeas corpus.

_____

[9]Collier also argues that he did not procedurally default his Rule 37 claim because he "fairly presented" it to the Arkansas Supreme Court. This attempt to convert his habeas petition into "an end run around the limits of [federal court] jurisdiction and a means to undermine the State's interest in enforcing its laws" has been recognized and rejected by the Supreme Court. *Coleman*, 501 U.S. at 731-32 ("In the absence of the independent and adequate state ground doctrine in federal habeas, habeas petitioners would be able to avoid the exhaustion requirement by defaulting their federal claims in state court."). Therefore, even if Collier fairly presented his claim to the Arkansas Supreme Court, our review is precluded unless he can demonstrate cause and prejudice or actual innocence to excuse the procedural default. *See Clemons*, 381 F.3d at 751-52.